UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                                        :
TYRONE HOLMES and SAMUEL'S TEMPLE
CHURCH OF GOD IN CHRIST, INC.,                          :

                                    Plaintiffs,         :        11 Civ. 1543 (LTS) (DF)

                     -against-                          :        **REPORT AND
                                                                 RECOMMENDATION**
THE ALLSTATE CORPORATION,                               :
BRYAN M. HARRIS, a.k.a. BRYAN
MICHAEL HARRIS, BLUEBOX                                 :
ENTERTAINMENT, INC., HARRIS
FINANCIAL INC., HARRIS FINANCIAL                        :
INSURANCE INC., ASSOCIATE
MANAGEMENT LLC, B.M. HARRIS INC.,                       :
FIRST ONE DISTRIBUTORS, INC., I AM
GLOBAL ENT. LLC, HARRIS FINANCIAL                       :
INSURANCE SERVICES,
                                                        :
                                    Defendants.
------------------------------------------------------------------------X

**TO THE HONORABLE LAURA T. SWAIN, U.S.D.J.:**

        In this diversity action, plaintiffs Tyrone Holmes ("Holmes") and the church of which he

has claimed to be the Executive Pastor, Samuel's Temple Church of God in Christ, Inc. (the

"Church" or "Samuel's Temple") (collectively, "Plaintiffs") have asserted a variety of state-law

claims against defendants the Allstate Corporation ("Allstate"), Bryan M. Harris ("Harris"), and

a number of corporate entities of which Harris is purportedly the principal (the "Harris

Entities"[1]) (collectively, "Defendants"), essentially alleging that Defendants mismanaged or

---

[1] The Harris Entities include:  Bluebox Entertainment, Inc. ("Bluebox"), Harris Financial,
Inc. ("HF"), Harris Financial Insurance, Inc. ("HFI"), B.M. Harris, Inc. ("BMH"), First One
Distributors, Inc. ("First"), Associate Management LLC ("Associate"), I Am Global Ent. LLC,
a/k/a Attracknaphobia, LLC ("IAGE"), and Harris Financial Insurance Services, Inc. ("HFIS").

stole more than half a million dollars that Plaintiffs had entrusted to Defendants for investment

or other purposes.

Currently pending before the Court for a report and recommendation are five separate

motions:

> (1)     a motion by Allstate to dismiss Plaintiffs' Amended
>         Complaint, as against Allstate (Dkt. 18);
>
> (2)     a cross-motion by Plaintiffs for leave to file a Second
>         Amended Complaint (Dkt. 33);
>
> (3)     a motion by Allstate against Plaintiffs for Rule 11 sanctions
>         for bringing a frivolous lawsuit against Allstate (Dkt. 27);
>
> (4)     a motion by Plaintiffs against Allstate for Rule 11
>         sanctions, for making purportedly false and unsupported
>         statements to the Court in motion papers (Dkt. 51); and
>
> (5)     a motion by Harris and the Harris Entities (collectively, the
>         "Harris Defendants") to dismiss Plaintiffs' Amended
>         Complaint as against them (*see* Dkt. 55).[2]

For the reasons set forth below, I respectfully recommend that Allstate's motion to dismiss

(Dkt. 18) be granted and that Plaintiffs' claims against Allstate be dismissed with prejudice.  I

further recommend that Plaintiffs' cross-motion to amend (Dkt. 33) be denied, as nothing in

Plaintiffs' proposed amended pleading would cure the defects in the Amended Complaint.  As

for the pending sanctions motions, I recommend that Allstate's motion against Plaintiffs

---

[2] The Harris Defendants never actually filed a "motion" to dismiss the Amended
Complaint; rather, they only filed a memorandum, with two attached declarations, in support of
such a motion.  The Court's Docket Clerk advised counsel that a memorandum and declarations
in support of a motion should not be filed until a formal "motion" had been filed (*see* Docket
entries following Dkt. 56), but it does not appear that counsel ever complied with the Court's
rules.  Nonetheless, given the nature of the arguments raised by the Harris Defendants in their
submission, which relate to the adequacy of Plaintiffs' pleading, this Court has determined that it
would be in the interest of effective case management to deem that submission a motion and to
consider it as such.

(Dkt. 27) be granted and that Plaintiffs' motion against Allstate (Dkt 51) be denied, as Plaintiffs' claims against Allstate are patently frivolous and Plaintiffs' sanctions motion against Allstate is procedurally defective and meritless.  On these motions, I recommend that Plaintiffs' counsel be ordered to pay to Allstate certain costs it has incurred, as set forth below.  Finally, I recommend that the motion by the Harris Defendants to dismiss Plaintiffs' claims against them (Dkt. 55) be granted, without prejudice to Plaintiffs' filing a Second Amended Complaint that satisfies the requirements of Rules 8(a) and 9(b) of the Federal Rules of Civil Procedure, with respect to Plaintiffs' claims against these defendants.

## BACKGROUND

### A.    The Amended Complaint

Initially proceeding *pro se*, Holmes filed the initial Complaint in this matter on his own behalf.  (*See* Complaint, dated Mar. 7, 2011 (Dkt. 1).)  Holmes then retained as counsel Eric Suffin, Esq. ("Suffin"), of the Law Firm of Eric Andrew Suffin, and, on June 1, 2011, Suffin filed an Amended Complaint, on behalf of both Holmes and the Church.  (*See* Amended Complaint, dated May 17, 2011 ("Am. Compl.") (Dkt. 17).)

#### 1.    Factual Allegations

At its core, the Amended Complaint alleges that Holmes and the Church entrusted Harris with more than half a million dollars, that Harris promised to make certain investments and purchases with the funds and also promised certain benefits to Holmes and his family, and that Harris broke these various promises.  The Amended Complaint alleges the following facts, which are accepted as true for purposes of the motions to dismiss:

Plaintiff Samuel's Temple is a non-profit religious organization that formerly owned a church in East Harlem, New York.  (*Id.* at ¶¶ 6,7.)  According to the Amended Complaint,

Holmes is the Executive Pastor and Music Director of Samuel's Temple.  (*Id.* at ¶ 3.)  Defendant

Harris is an Allstate agent and franchisee (*id.* at ¶ 10), who also operates defendant HFIS (*id.* at

¶ 13).  The Amended Complaint does not describe the nature of HFIS or the other Harris

Entities, other than to allege that they are all "alter egos" of one another.  (*Id.* at ¶¶ 15-22.)

　　　In 2006, Plaintiffs received $1 million from a developer (*id.* at ¶ 27), and Defendants

suggested that Plaintiffs' capital be invested with them (*id.* at ¶ 32).[3]  Defendants promised

Plaintiffs at least a 15-20% profit within two years of their investment.  (*Id.* at ¶ 33.)  Harris was

to serve as Plaintiffs' investment advisor and business manager for their capital investments, and

Defendants proposed investments in real estate, insurance, an entertainment company (defendant

Bluebox), and various securities and derivatives.  (*Id.* at ¶¶ 34, 37, 49.)  In connection with their

proposal, Defendants also allegedly promised many personal benefits for Holmes, including

housing for him and his family in Georgia, insurance for him and his family, and appointments

to several executive positions at Bluebox.  (*Id.* at ¶¶ 38, 47, 49.)

　　　On the basis of these representations, Plaintiffs allegedly invested approximately

$513,000.[4]  (*Id.* at ¶ 53.)  More specifically, Plaintiffs made a series of wire transfers to Bluebox,

---

[3] The Amended Complaint predominately refers to "plaintiffs," without distinguishing between Samuel's Temple and Holmes.  (*See generally* Am. Compl.)  Similarly, throughout the Amended Complaint, Plaintiffs refer generally to actions of the "defendants," without differentiating among Allstate, Harris, or any of the Harris Entities.  (*See generally id.*)

[4] Plaintiffs generally allege that they invested approximately $513,000 with Defendants (*id.* at 53), but the more specific allegations concerning Plaintiffs' investments suggest a total of $543,000 (*see id.* at ¶¶ 56-58, 60 (alleging various wire transfers to Bluebox in amounts totaling $500,000); ¶ 61 (alleging cash investment of $15,000); ¶ 55 (alleging downpayment of $28,000 for real estate)).

from August 2006 through February 2007, in amounts that totaled approximately $500,000.[5]

(*Id.* at ¶¶ 56-58, 60.)  Plaintiffs also invested approximately $15,000 in cash with Defendants,

and made a $28,000 down payment for a piece of real estate.  (*Id.* at ¶¶ 55, 61.)  Defendants sent

Plaintiffs promissory notes regarding amounts of $320,000 and $50,000, promising repayment of

these principal amounts, together with interest, at a rate of 8.5% per annum on the unpaid

balance, and promising balloon payments in the form of cashier's checks.  (*Id.* at ¶ 59.)  Despite

demand, Plaintiffs allege that they have not received any money back from their investments

with Defendants, nor have they received an accounting regarding their investments.

(*Id.* at ¶¶ 69-72.)  As described more specifically below, Plaintiffs also allege that Defendants

did not follow through on their various alleged promises.

### a. <u>Blue Box</u>

Holmes alleges that, as part of the alleged investment deal, he was promised stock and a

number of positions at the entertainment company Bluebox.  (*Id.* at ¶ 47.)  Holmes was allegedly

to become the Chief Executive Officer of Bluebox, as well as its Director of Music Production

and Video Production.  (*Id.*)  Holmes was also to be appointed as Musician, Webmaster, Digital

Music Engineer, and Songwriter for Bluebox.  (*Id.*)  Holmes and Samuel's Temple, together,

were to become 51% stockholders of Bluebox.  (*Id.*)  Harris agreed to reduce his own stock

holdings in Bluebox to only 49%, although he promised to serve as Bluebox's Chief Financial

Officer and Business Manager.  (*Id.* at ¶ 48.)  Finally, Defendants promised to file "any required

---

[5] On or about August 17, 2006, Plaintiffs transferred approximately $80,000 to Bluebox; on or about August 21, 2006, Plaintiffs transferred approximately $50,000 to Bluebox; on or about September 12, 2006, plaintiffs transferred approximately $320,000 to Bluebox; and on or about February 3, 2007, Plaintiffs transferred approximately $50,000 to Bluebox.  (*See id.* at ¶¶ 56-58, 60.)

annual tax documents relating to Bluebox, and plaintiff Holmes's personal income taxes as a salaried corporate officer and employee of Bluebox."  (*Id.* at ¶ 44.)

According to the Amended Complaint, Defendants have admitted to omitting Plaintiffs' names from documents regarding control of Bluebox.  (*Id.* at ¶ 76.)

### b.   **Real Estate**

### i.   **921 Moreland Avenue**

According to Plaintiffs, part of their money was supposed to be used to buy a house that, at the time, belonged to Harris, and Holmes and his family were to live in it.  (*Id.* at ¶¶ 47, 55.) Under the agreement, Samuel's Temple would become the titleholder of the property, which was located at 921 Moreland Avenue, in Atlanta, Georgia.  (*Id.* at ¶¶ 47, 55.)  Defendants allegedly represented that they would secure a purchase mortgage for Plaintiffs and make mortgage payments with Plaintiffs' capital investment.  (*Id.* at ¶ 77.)  Plaintiffs allege that on or around March 16, 2006, Plaintiffs gave Defendants $28,000 as a down payment on this house.  (*Id.* at ¶ 55.)

On or around December 28, 2007, Harris sent Plaintiffs an email indicating that the Moreland Avenue property, which Holmes and his family were by then occupying, was in danger of being foreclosed.  (*Id.* at ¶ 79.)

Then, at some point in 2008, while Holmes was in New York, Harris allegedly entered the Moreland Avenue property, which Holmes was still using as a residence, and removed personal property belonging to Holmes, including a rifle, hard drives, two speakers, video footage, sound tools, documents, video masters, and music masters.  (*Id.* at ¶ 80.)  A person believed to be an agent of the City of Atlanta Police Department allegedly stood outside of the

Moreland Avenue property while Harris entered the home and left with Holmes' personal property.  (*Id.* at ¶ 80.)

At a later point in 2008, the house at 921 Moreland Avenue was foreclosed and Plaintiffs were evicted.  (*Id.* at ¶ 81.)  Plaintiffs allege that, despite the representations made by Defendants, Defendants never obtained a purchase mortgage for Plaintiffs for the Moreland Avenue property, and Defendants failed to use Plaintiffs' capital investment to make mortgage payments on that property.  (*Id.* at ¶ 77.)

### ii.    Other Allegations Regarding Real Estate

HFIS and Harris, as an agent of Allstate, had an office at 1133 Forest Parkway, in Forest Park, Georgia.  (*Id.* at ¶ 14.)  In April of 2007, Defendants told Plaintiffs that Defendants had sold the mall that contained this office.  (*Id.* at ¶ 67.)  The Court is unclear as to whether Plaintiffs are claiming any interest in this mall.

Plaintiffs also allege that "[i]n or about 2008, defendants represented to plaintiffs that defendants bought a parcel and properties for the benefit of plaintiffs and lost the parcel and properties."  (*Id.* at ¶ 68.)  It is not clear to the Court whether this allegation refers to the property at 921 Moreland Avenue, discussed above, or to another piece of property.

### c.    Insurance

Plaintiffs allege that Defendants said that they would purchase and maintain life insurance for Holmes and his family.  (*Id.* at ¶¶ 49, 39.)  Although Defendants later represented that they had purchased a $5,000 life insurance policy, this policy allegedly lapsed in November of 2010.  (*Id.* at ¶¶ 62, 63, 82.)  According to Plaintiffs, Defendants also represented that they had purchased "business insurance policies" for the benefit of Plaintiffs (*id.* at ¶ 62), but the

Amended Complaint does not indicate whether Defendants actually made such purchases, or, if

so, whether these insurance policies also lapsed.

### d.     Loans to an Elected Representative

Plaintiffs allege that Defendants loaned $20,000 to Ron Sailor Jr. (identified in the

Amended Complaint as a Georgia Congressman)[6] from Plaintiffs' capital investment.  (*Id.* at

¶ 64.)  Plaintiffs do not indicate whether this loan was authorized by Plaintiffs or whether the

loan was repaid.

### e.     Documents

At some point, Defendants allegedly sent Plaintiffs a large collection of Allstate

documents containing personal information of thousands of Allstate policyholders and other

policyholders.  (*Id.* at ¶ 29.)  Plaintiffs assert that they stored these documents for nine years,

without compensation, incurring approximately $10,080 in storage costs.  (*Id.* at ¶ 30.)[7]

---

[6] The Court takes judicial notice of the fact that Walter Ronnie Sailor, Jr., was a Georgia state assemblyman (not a member of the U.S. Congress), who left office after pleading guilty to federal wire fraud and money laundering charges.  *See* http://www.justice.gov/usao/gan/press/2008/06-17-08.pdf.

[7] At the initial case conference before this Court on July 26, 2011, the parties informed the Court that Holmes was in possession of certain Allstate documents, which contained confidential information related to Allstate's current or former policyholders (the "Allstate Documents").  According to Holmes' counsel, these documents had been given to Holmes, years ago, by Harris.  (*See* July 26, 2011 Rule 16 Conference Transcript, at 12, Ex. D to Declaration of Elizabeth D. Schrero in Opposition to Plaintiffs' Motion for Sanctions Under Rule 11, dated Oct. 17, 2011 ("10/17/11 Schrero Decl.") (Dkt. 57).)  The Court directed Holmes to transfer the Allstate Documents to Allstate's counsel, and directed Allstate to maintain these documents in its possession and to preserve them for use as potential evidence in this case.  (*See* Scheduling Order, dated Aug. 4, 2011 (Dkt. 30).)  At the following case conference on November 1, 2011, the document transfer having been made, Allstate's counsel informed the Court that, among the transferred documents were certain documents in which Allstate claimed no interest, and which appeared, on their face, to be documents, such as ledgers, related to the operations of Harris's business(es).  This Court directed Allstate to return that subset of the transferred documents (the "Harris Documents") to counsel for Holmes, and directed counsel for Holmes to maintain the

2.       **Legal Claims and Alleged Damages**

Plaintiffs assert nine claims against Defendants.  One of these claims – for *prima facie* tort – is asserted solely against Harris.  The eight remaining claims are brought against all Defendants.  These claims include:  (1) conversion; (2) fraud; (3) violation of New York Debtor and Creditor Law § 276; (4) negligent misrepresentation; (5) promissory estoppel; (6) unjust enrichment; (7) breach of contract; and (8) negligent infliction of emotional distress.

Plaintiffs demand $10 million in damages for the death of a Samuel's Temple member (whose death was allegedly "[d]irectly related to the conduct of defendants"), loss of business opportunities, loss of the ability to operate a school, harm to reputation, financial distress, harm to familial relations, and loss of employment at Bluebox.  (Am. Compl. at ¶¶ 15, 86, 87, 88, 89, 94.)

B.       **Motions before the Court**

1.       **Allstate's Motions To Dismiss and for Sanctions**

On June 28, 2011, Allstate moved to dismiss the Amended Complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  (*See* Notice of Motion To Dismiss Plaintiffs' Amended Complaint as Against Defendant the Allstate Corporation ("Allstate Mtn. To Dismiss"), dated June 28, 2011 (Dkt. 18).)  Allstate seeks dismissal on the grounds that the Amended Complaint consists of improper "group" allegations against "defendants," that it alleges no direct action by Allstate and no conduct by Allstate that could make it liable for the

---

Harris Documents as "Attorneys Eyes Only."  This Court further directed counsel for Holmes either to deliver copies of the Harris Documents to counsel for Harris or to make the documents available to Harris's counsel for inspection and copying.  (*See* Scheduling Order, dated Nov. 4, 2011 (Dkt. 61).)

actions of any of the other defendants, and that each individual claim fails for additional and independent reasons.  (*See generally* Allstate Mtn. To Dismiss.)

Allstate has also filed a motion for sanctions against Plaintiffs, as well as their counsel, under Rule 11 of the Federal Rules of Civil Procedure and based on the Court's inherent authority.  (*See* Notice of Motion For Sanctions Under Rule 11 ("Allstate's Sanctions Mtn."), dated July 29, 2011 (Dkt. 27).)  In its sanctions motion, Allstate contends that, as against Allstate, the Amended Complaint is frivolous and without any factual or legal basis.  (*Id.*)

### 2.     Plaintiffs' Motions for Leave To Amend and for Sanctions

On August 5, 2011, Plaintiffs opposed Allstate's motion to dismiss and filed a cross-motion for leave to file a Second Amended Complaint.  (Notice of Cross-Motion, dated Aug. 5, 2011 (Dkt. 33).)  Plaintiffs argue that, because Harris was an agent and franchisee of Allstate, Allstate is liable for the acts alleged in the Amended Complaint.  (Plaintiff's Memorandum of Law in Opposition to Defendant the Allstate Corporation's Motion To Dismiss Plaintiff's Amended Complaint and in Support of Plaintiff's Cross-Motion for Leave To File a Second Amended Complaint ("Pl. Opp. Mem. to Allstate Mtn."), dated Aug. 5 (Dkt. 34[8]), at 4.)  Primarily on this basis, Plaintiffs contend that each of their eight claims against Allstate is well-founded.  (*Id.* at 6-11.)  Nonetheless, Plaintiffs also request leave of Court to file the proposed Second Amended Complaint that they submit with their cross-motion.  (*Id.* at 11.)

On September 30, 2011, Plaintiffs filed a motion for sanctions against Allstate.  (Notice of Motion, dated Sept. 30, 2011 (Dkt. 51).)  Plaintiffs allege that certain statements contained in Allstate's memoranda in support of its two motions, and in a Declaration supporting Allstate's

---

[8] Through an apparent filing error, Plaintiffs' opposition memorandum was filed, in various parts, as Docket entries 34, 36 and 38.

motion to dismiss and opposing Plaintiffs' cross-motion for leave to amend, are without evidentiary support.  (Plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion for Rule 11 Sanctions, dated Sept. 30, 2011 ("Pl. Sanctions Mem.") (Dkt. 53), at 2.)

### 3.   Motions of the Harris Defendants

On October 11, 2011, the Harris Defendants filed their own motion to dismiss the Amended Complaint.  (*See* Memorandum of Law in Support of the Motion of Defendants, Bryan M. Harris a/k/a Bryan Michael Harris, Bluebox Entertainment, Inc., Harris Financial Insurance Services, Inc., Harris Financial, Inc., Harris Financial Insurance, In. Associate Management LLC, B.M. Harris Inc., First One Distributors, Inc., I Am Global Ent. LLC a/k/a Attracknaphobia, LLC To Dismiss The Amended Complaint ("Harris Mtn. To Dismiss"), dated Oct. 9, 2011 (Dkt. 55).)  The Harris Defendants contend that Plaintiffs have no standing to bring their claims; that, as a general matter, the Amended Complaint is inadequately pleaded;  and that the nine claims also fail for independent reasons.  (*See id.*)

In opposition to the Harris Defendants' motion, Plaintiffs argue that each of their claims against these defendants is sufficient as pleaded, and Plaintiffs also submit additional documents related to the issue of standing and ask for leave to file an "Alternative Second Amended Complaint," which they submit with their opposition papers.  (*See* Plaintiffs' Memorandum of Law in Opposition to Harris Defendants' Motion To Dismiss ("Pl. Opp. Mem. to Harris Mtn."), dated Nov. 10, 2011 (Dkt. 64); *see also* Affidavit of Tyrone Holmes, dated Nov. 7, 2011 (Dkt. 65); *see also* Declaration of Eric Andrew Suffin in Opposition to Harris Defendants' Motion To Dismiss, dated Nov. 10, 2011 ("11/10/11 Suffin Decl.") (Dkt. 66).)

## DISCUSSION

I.   **ALLSTATE'S MOTION TO DISMISS AND
     PLAINTIFFS' CROSS-MOTION TO AMEND**

    A.   **Applicable Legal Standards**

        1.   **Rule 12(b)(6)**

A case is subject to dismissal under Rule 12(b)(6) where the complaint is not legally sufficient to state a claim upon which relief can be granted. *See Kopec v. Coughlin*, 922 F.2d 152, 155 (2d Cir. 1991). In deciding a Rule 12(b)(6) motion, the Court "accept[s] as true all factual statements alleged in the complaint and draw[s] all reasonable inferences in favor of the non-moving party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007) (citation omitted); *accord Jaghory v. New York State Dep't of Educ.*, 131 F.3d 326, 329 (2d Cir. 1997). A court should grant dismissal where, after considering the plaintiff's allegations in this generous light, "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Walker v. City of New York*, 974 F.2d 293, 298 (2d Cir. 1992), *cert. denied*, 507 U.S. 961 (1993). At the same time, "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to defeat a motion to dismiss." *Achtman v. Kirby, McInerney & Squire, LLP*, 464 F.3d 328, 337 (2d Cir. 2006) (citation omitted). Rather, in order to withstand a motion to dismiss, a complaint must plead "enough facts to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) ("[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged").

2.      **Rule 15(a)**

Rule 15(a) of the Federal Rules of Civil Procedure governs the amendment of complaints and provides that the court "should freely give leave when justice so requires." Fed. R. Civ. P. 15(a).  A motion to amend should be denied, however, "if there is an 'apparent or declared reason – such as undue delay, bad faith or dilatory motive . . . repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of the allowance of an amendment, [or] futility of amendment.'"  *Dluhos v. Floating and Abandoned Vessel Known as "New York,"* 162 F.3d 63, 69 (2d Cir. 1998) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

An amendment is considered futile when the proposed new claim would not withstand a motion to dismiss, either for failure to state a cause of action, or on another ground.  *See Milanese v. Rust-oleum Corp.*, 244 F.3d 104, 110 (2d Cir. 2001).  Thus, if a proposed amendment would be subject to "immediate dismissal" on some ground, the Court will not permit the amendment.  *See Jones v. N.Y. State Div. of Military & Naval Affairs*, 166 F.3d 45, 55 (2d Cir. 1999).  If, on the other hand, the party seeking to amend "has at least colorable grounds for relief, justice . . . require[s]" that its motion be granted.  *Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities Inc.*, 748 F.2d 774, 783 (2d Cir. 1984) (citation omitted).

B.      **Adequacy of Plaintiffs' Allegations Against Allstate**

Allstate makes a number of arguments for dismissing the claims against it.  As an initial matter, Allstate argues that in order to state a claim against it, Plaintiffs would have to proceed under a theory that Harris had apparent authority to act on Allstate's behalf, but that Plaintiffs have not pleaded any facts sufficient to support the conclusion that Harris had such authority. Allstate also argues that the Amended Complaint fails to satisfy Rules 8(a) and 9(b) of the

13

Federal Rules of Civil Procedure.  Finally, Allstate advances arguments for dismissing each of the eight individual claims against it on independent grounds.  As this Court agrees that Plaintiffs have not pleaded facts sufficient to support any claim based on apparent authority, on which all of Plaintiffs' claims necessarily rest, I recommend that Allstate's motion to dismiss be granted on that ground, without regard to Allstate's other arguments.

1.     **Lack of Allegations of Apparent Authority**

The Amended Complaint contains few allegations that relate, in particular, to Allstate.  Instead, as noted above (*see* n. 3, *supra*), Plaintiffs claim that "defendants" made and broke a range of promises.  At best, Plaintiffs' use of the term "defendants" throughout the Amended Complaint is vague.  At other times, Plaintiffs' method of group pleading is incoherent or illogical.[9]  Given that Plaintiffs do not allege that Allstate itself engaged in any activity that would give rise to independent liability, Allstate argues that Plaintiff's theory of liability must be premised on Harris's actions and the doctrine of apparent authority.  Under this doctrine, as

───────────────

[9] For example, the Amended Complaint alleges that "Plaintiffs and defendants agreed that plaintiff Holmes would be Chief Executive Officer, Director of Music Production and Video Production, Musician, Webmaster, Digital Music Engineer and Songwriter, of, for and with defendant Bluebox, while living in real estate purchased with plaintiffs' capital . . . plaintiff Church to benefit from potential profits of defendant Bluebox, plaintiffs to be 51% stockholders of defendant Bluebox." (*Id.* at ¶ 47.)  It is difficult to understand how defendant Allstate could have made such promises.  As another example, Plaintiffs allege that "[i]n or about April, 2007 defendants told plaintiffs that defendants sold the mall that defendants' Forest Park, Georgia office was located in."  (*Id.* at ¶ 67.)  Construing the term "defendants" to include all of the Harris Entities, as well as Allstate, would make little sense in this instance because defendants Bluebox, HF, HFI, BMH, First, Associate, and IAGE are not alleged to have had any connection to an office in Forest Park, Georgia, nor does it seem likely that these defendants or Allstate would have been involved in the alleged sale of the mall that contained this office.  (*See id.* ¶¶ 12-14.)

explained by the New York Court of Appeals,[10] liability against a principal may arise if the

principal's affirmative conduct causes a third party reasonably to believe that an agent has

authority to act on behalf of the principal:

> Essential to the creation of apparent authority are words or conduct
> of the principal, communicated to a third party, that give rise to the
> appearance and belief that the agent possesses authority to enter
> into a transaction.  The agent cannot by his own acts imbue
> himself with apparent authority.  Rather, the existence of 'apparent
> authority' depends upon a factual showing that the third party
> relied upon the misrepresentation of the agent because of some
> misleading conduct on the part of the principal – not the agent.
> Moreover, a third party with whom the agent deals may rely on an
> appearance of authority only to the extent that such reliance is
> reasonable.

*Hallock v. State of New York*, 64 N.Y.2d 224, 231 (1984) (internal quotations and citations

omitted); *see also Ford v. Unity Hospital*, 32 N.Y.2d 464, 472-73 (1973) ("The apparent

authority for which the principal may be held liable must be traceable to him; it cannot be

established by the unauthorized acts, representations or conduct of the agent").  Here, Allstate

argues that Plaintiffs have not sufficiently alleged any facts that could support a finding that

_____

[10] In this diversity action, plaintiff Holmes alleges that he is a New York resident, and
Samuel's Temple also appears to be located in New York.  (*See* Am. Compl. at ¶¶ 2, 6, 7.)
Defendant Harris is alleged to be a resident of Georgia, and the Harris Entities allegedly have
principal places of business, or are incorporated, in Georgia.  (*See id.* at ¶¶ 11, 12, 14, 23.)
Defendant Allstate is alleged to have its principal place of business in Illinois.  (*See id.* at ¶ 9.)
The subject matter of the alleged contract(s) at issue was located in Georgia, and the alleged
promises seem to have been made while Harris was in his Georgia office.  (*See id.* at ¶¶ 37, 38,
54, 79.)  Although this could potentially raise choice of law issues, the parties' submissions all
cite New York case law.  Such "implied consent . . . is sufficient to establish choice of law."
*Khubani v. Ionic White, Inc.*, No. 05 Civ. 3706 (DC), 2008 U.S. Dist. LEXIS 30610, at *3
(S.D.N.Y. Apr. 3, 2008) (citing *In re Tehran-Berkeley Civil & Environmental Engineers*, 888
F.2d 239, 242 (2d Cir. 1989)); *see also Global Switching Inc. v. Kasper*, No. CV-06-412 (CPS),
2006 U.S. Dist. LEXIS 44450, at *32 n.10 (E.D.N.Y. June 29, 2006) ("In any event, where, as
here, the parties are silent about the choice of law question, the Court may apply the law of the
forum.") (citing *Michele Pommier Models v. Men Women N.Y. Model Mgmt.*, 14 F. Supp. 2d
331, 336 (S.D.N.Y. 1998)).

Harris was authorized by Allstate to make the promises or engage in the transactions that form the basis of Plaintiffs' claims.

Plaintiffs do not deny that they are proceeding against Allstate on a theory of apparent authority (*see* Pl. Opp. Mem. to Allstate Mtn. at 4), but they maintain that their allegations are sufficient to implicate Allstate under that theory.  Specifically, the Amended Complaint contains the following allegations regarding the nature of Allstate's business, its relationship with Harris, and the role that Plaintiffs were supposedly led to believe that Allstate would take with respect to Plaintiffs' money and investments:

- Allstate "is purportedly an insurance, retirement, investment, and banking company, purporting to offer Asset Protection, Wealth Transfer, Family Protection Insurance, Financial Products, Asset Management and Accumulation, and Asset Management Short-term Financial Objectives."  (Am. Compl. at ¶ 8.)

- Harris "was and is an Agent and Franchisee with, of and for defendant Allstate."  (*Id.* at ¶ 10.)

- "[A]s an Agent of defendant Allstate[,] defendant Harris offered Allstate financial services, while simultaneously operating under the corporate name of defendant Harris Financial Insurance Services, Inc."  (*Id.* at ¶ 13.)

- "At the time the plaintiffs received one million dollars in or about 2006 plaintiff Holmes believed that defendant Harris operated the most successful Allstate operation/business in the southeast region of the United States of America for the previous ten years, pursuant to representations to that effect by defendants."  (*Id.* at ¶ 31.)

- "Defendants represented to plaintiffs that capital invested by plaintiffs with defendants would be invested with defendant Allstate in the name of plaintiff Church."  (*Id.* at ¶ 36.)

- "Defendants Harris, HFIS, Bluebox, HF, HFI, BMH, First, Associate, and IAGE used the Allstate name and logo to

16

convince plaintiffs to invest with defendants, assuring
plaintiffs that the investments were to be with Allstate."
(*Id.* at ¶ 46.)

•   "Defendants represented that plaintiffs' capital investment
would be maintained and supervised by Allstate."  (*Id.* at
¶ 52.)

•   "On the basis of the representations made to plaintiffs by
defendants, and relying upon defendants' advice and
representation that Allstate was exercising certain controls
and safeguards upon defendant Harris, plaintiffs invested
approximately five hundred and thirteen thousand dollars
with defendants."  (*Id.* at ¶ 53.)

•   Harris "openly conducted plaintiffs' business and discussed
plaintiffs' financial transactions during business hours
while in Allstate offices, acting as an Agent of Allstate."
(*Id.* at ¶ 54.)

•   "Defendants represented to plaintiffs that defendant
Allstate was the entity that sold certain securities and
derivatives, life insurance policies and business insurance
policies to plaintiffs."  (*Id.* at ¶ 65.)

Plaintiffs also generally allege that each defendant is an "alter ego" of the other defendants.  (*Id.*
at ¶¶ 15-22.)

Yet, while these allegations may suggest that Harris, holding himself out as an Allstate

agent, made certain representations to Plaintiffs regarding Allstate's involvement in the planned

investment transactions, missing from the Amended Complaint is any allegation that Allstate

*itself* engaged in any affirmative conduct that could have caused Plaintiffs reasonably to believe

that Harris had the authority to bind Allstate to promises regarding how Plaintiffs' money would

be spent or invested.  *See Imburgio v. Toby*, 920 N.Y.S.2d 43, 43 (1st Dep't 2011) (granting

motion to dismiss where plaintiffs failed to allege facts that would impute liability to defendant,

holding that, "[w]hile plaintiffs asserted that defendant's employee was vested with apparent

17

authority based upon the employee's representations concerning the transactions at issue, such authority may arise only from the conduct of the principal, not the agent").

Despite its repeated references to actions undertaken by "defendants," the Amended Complaint implies that Harris made the promises and engaged or failed to engage in the conduct that underlies this action. (*See* Am. Compl. at ¶ 54 ("Defendant Harris openly conducted plaintiffs' business and discussed plaintiffs' financial transactions during business hours while in Allstate offices, acting as an Agent of Allstate.").) Indeed, even Plaintiffs' allegations that refer generally to the conduct of "defendants" suggest, in context, that Harris was the actor. For example, when Plaintiffs allege that they made wire transfers to Bluebox, a Harris company, "relying upon defendants' advice and representation that Allstate was exercising certain controls and safeguards" (*id.* at ¶¶ 56-58), Plaintiffs identify no action or words *by Allstate* regarding its involvement with Bluebox, much less any action or words by Allstate that could have led Plaintiffs to have the reasonable belief that Allstate was indeed exercising any such "controls and safeguards." In short, the Amended Complaint contains no allegations that Allstate did anything to make Plaintiffs believe that Harris had the authority to bind Allstate to any promises or that Harris's promises were being made on Allstate's behalf. In fact, neither the Amended Complaint nor common sense suggest any basis on which a reasonable person could have believed that Harris had the authority to bind Allstate to the types of promises alleged.[11]

---

[11] For example, it is nearly inconceivable that Allstate would have authorized the transfer to Holmes of a large volume of Allstate documents containing confidential information of other policyholders, or that Allstate would – or even could – have authorized the loan of Plaintiffs' funds to a state legislator or the promise of Holmes' employment with Harris's entertainment company.

In opposition to Allstate's motion to dismiss, Plaintiffs rely on *Kirschner v. KPMG LLC*, 15 N.Y.3d 446 (2010), for the proposition that "[a] corporation must . . . be responsible for the acts of its authorized agents even if particular acts were unauthorized." *Id.* at 465 (cited in Pl. Opp. Mem., at 4.)  Plaintiffs' reliance on *Kirschner* is misplaced, as, even assuming that Plaintiffs have adequately pleaded, or can plead, that Harris was an authorized Allstate *insurance agent,* "[t]he mere creation of an agency for some purpose does not automatically invest the agent with 'apparent authority' to bind the principal without limitation." *Ford v. Unity Hospital*, 32 N.Y.2d 464, 472-73 (1973).  Rather,

> [a]n agent's power to bind his principal is coextensive with the principal's grant of authority.  One who deals with an agent does so at his peril, and must make the necessary effort to discover the actual scope of authority.  Upon failure to properly determine the scope of authority, and in the face of damages resulting from an agent's misrepresentations, 'apparent authority' is not automatically available to the injured third party to bind the principal . . . The very basis of the doctrine of apparent authority indicates that the principal can be held liable under the doctrine only where he was responsible for the appearance of authority in the agent to conduct *the transaction in question*.

*Id.* (internal citations and quotations omitted) (emphasis added).  Here, other than stating, in general terms, that Allstate, as a company, offers a number of financial services (Am. Compl. at ¶ 8), Plaintiffs have made no factual allegations to support their claim that Allstate ever authorized Harris to act as its agent for any purpose other than, perhaps, the placement of insurance.  Plaintiffs' bare allegation that Harris was an "agent" of Allstate is simply insufficient to plead liability by Allstate, under the doctrine of apparent authority, for the wide variety of claims Plaintiffs assert.

Finally, although Plaintiffs allege that Harris was supposed to provide insurance policies for them through Allstate, the Amended Complaint does not allege any failure by Allstate to

provide insurance[12] or to honor any insurance obligations.  Nor do Plaintiffs allege that Allstate made any false statements regarding the terms of any policy issued to them or regarding whether such a policy had been renewed.  Rather, to the extent any insurance policy is even implicated in the Amended Complaint, Plaintiffs merely appear to complain that Harris failed to use Plaintiffs' funds to make regular payments of policy premiums, after promising that he would.  Again, this does not suggest any culpable conduct by Allstate.

In sum, the Amended Complaint fails to allege *any* factual basis for Plaintiffs' position that Harris had apparent authority to bind Allstate with respect to any of the many investment schemes alleged in this case.  It also fails to allege *any* conduct, whatsoever, by Allstate that could have induced reliance on the part of Plaintiffs.  While Plaintiffs allege that "defendants" failed to keep numerous promises, Plaintiffs do not specify that a single promise was ever made or sanctioned by Allstate.  For these reasons, Plaintiffs' claims against Allstate cannot stand, and the Amended Complaint should be dismissed, as against Allstate, under Rule 12(b)(6), for failure to state a claim.[13]

### 2.  Futility of Plaintiffs' Proposed Second Amended Complaint

In response to Allstate's motion to dismiss, Plaintiffs seek leave to file a Second Amended Complaint, presumably in an attempt to cure any pleading defect.  Plaintiffs, however, have actually submitted three different versions of a proposed Second Amended Complaint to the Court.  Through what the Court assumes was attorney error, Plaintiffs filed one version of a

---

[12] The Amended Complaint alleges, in fact, that a life insurance policy for Holmes and his children was issued (*id.* at ¶ 82), although Plaintiffs do not make clear whether this policy was issued by Allstate or by another carrier.

[13] As the Amended Complaint is defective for the reasons stated herein, the Court need not address Allstate's alternative arguments for dismissal.

proposed amended pleading on the Court's Electronic Case Filing ("ECF") system, but apparently served on Allstate (and submitted to this Court as a "courtesy copy") a non-conforming version.  (*See* Second Amended Complaint ("2d Am. Compl."), Ex. A to Declaration of Eric Andrew Suffin, dated Aug. 5, 2011 ("8/5/11 Suffin Decl.") (Dkt. 35); *see also* Service Copy of Second Amended Complaint ("Served 2d Am. Compl."), Ex. A to 8/5/11 Suffin Decl.)  Then, later, in response to the Harris Defendants' separate motion to dismiss, Plaintiffs filed yet a third version, styled as an "Alternative Second Amended Complaint."  (*See* Alternative Second Amended Complaint ("Alt. 2d Am. Compl."), Ex. A to 11/10/11 Suffin Decl.)  With regard to allegations concerning Allstate, all three versions differ only slightly from the Amended Complaint, and none of the versions cure the defects discussed above, as none allege facts sufficient to show that Harris had apparent authority to bind Allstate to any of the alleged promises.

In their proposed amended pleadings, Plaintiffs first add an allegation that, outside Harris's Forest Park office, there were signs that displayed (1) the Allstate logo, (2) a telephone number for "Forest Park Allstate," and (3) the names of both Harris and defendant HFIS.  (*See* 2d Am. Compl. at ¶ 51; Alt. 2d Am. Compl. at ¶ 59; *see also* Served 2d Am. Compl. at ¶ 48.)  Plaintiffs also add a number of allegations about information available on Allstate's corporate website, as follows:

> • "Defendant Allstate maintains and at other relevant times maintained an internet website address accessible to the public @ www.allstate.com." (2d Am. Compl. at ¶ 10; Alt. 2d Am. Compl. at ¶ 16; *see also* Served 2d Am. Compl. at ¶ 10.)
>
> • "At defendant Allstate's website and at other websites advertising defendant Allstate[,] defendant Allstate represents to the public that defendant Allstate offers

21

'financial' 'products' or 'services.'" (2d Am. Compl. at ¶ 52; Alt. 2d Am. Compl. at ¶ 60; *see also* Served 2d Am. Compl. at ¶ 49 (same, except for omission of reference to "services").)

- "Initially in 2004 or 2005, in 2006 and in 2007 before investing with defendants plaintiffs visited www.allstate.com and observed that defendant Allstate does stocks and investor relations." (2d Am. Compl. at ¶ 59; Alt. 2d Am. Compl. at ¶ 67; *see also* Served 2d Am. Compl. at ¶ 56 (same except for omission of reference to dates).)

- "Between 2005 and 2011 plaintiffs have visited the www.allstate.com website many times since first observing that defendant Allstate does stocks and investor relations." (2d Am. Compl. at ¶ 60; Alt. 2d Am. Compl. at ¶ 68; *see also* Served 2d Am. Compl. at ¶ 57 (same except for omission of dates).)

Lastly, Plaintiffs add an allegation that their claims "may be supported by documents, including but not limited to documents attached as Exhibits A, B, C and D." (2d Am. Compl. at ¶ 121; Alt. 2d Am. Compl. at ¶ 129; *see also* Served 2d Am. Compl. at ¶ 118.) The four referenced exhibits are attached to all three versions of Plaintiffs' proposed Second Amended Complaint. Exhibit A is a photograph of a block of signs. There is a sign for Allstate at the top of the block, and underneath the Allstate sign is a sign that reads "Harris Financial Insurance Services, Inc.," with a phone number. (Ex. A to 2d Am. Compl., Alt. 2d Am. Compl.; Served 2d Am. Compl.) At the lower right of the block, another sign reads "Allstate Bryan Harris." (*Id.*)

Exhibit B appears to be a series of screen prints of web pages. (Ex. B to 2d Am. Compl., Alt. 2d Am. Compl., Served 2d Am. Compl.) The first page, which appears to have been taken from an Allstate website, lists services offered by Allstate. (*Id.*) The next two pages seem to be results from some type of Internet search involving Harris and Allstate. (*See id.*) None of the listed search results are Allstate websites. (*Id.*) The next several pages include, *inter alia,* a

22

screen print apparently taken from another Allstate web page, referring to Harris and stating, in part: "Bryan Harris is licensed to sell Allstate insurance products only in the state(s) of Georgia. If you do not reside in the state(s) of Georgia or you're not insuring property located in the state(s) of Georgia, please go to the Find an Agent section on allstate.com to search for another agent." (*Id.*)  Also included are a number of web pages taken from non-Allstate websites, such as superpages.com, insiderpages.com, and citysearch.com, which refer in some way to Allstate or Harris.  (*Id.*)  The exhibit also includes what appears to be a screen print of a webpage from a Bluebox Entertainment website, listing Harris as the CEO and Director of Operations.  (*Id.*)  The last page of the exhibit appears to be a screen print of an Allstate web page that refers to an individual named Sam Noah, identified on the page as a Personal Financial Representative in New York; this individual is nowhere mentioned in Plaintiffs' Amended Complaint or memoranda.  (*See id.*)

Exhibit C is comprised of several email messages, together with two unsigned promissory notes and certain other documents, which seem to have been email attachments. (*See* Ex. C to 2d Am. Compl., Alt. 2d Am. Compl., Served 2d Am. Compl.)  The promissory notes, which are the first documents appearing in this exhibit, do not bear Allstate's name or logo, and, while they identify "Samuel's Temple" as the lender, they do not identify the borrower or the guarantor.  (*See id.*)  At least some of the emails contained in the exhibit seem to be correspondence between Holmes and Harris, and relate to a variety of topics, including "Blue Box Wiring Information," "Life Insurance," "Bishop Long," and "Tax ID Info."  (*See id.*)  In certain of the emails, Harris is identified as "Director of Operations" of Bluebox.  (*See id.*)  The entire exhibit seems disjointed, as the pages do not appear to be in any sort of order, and the pages are variously forwards, backwards, right-side-up, and upside-down.  (*See id.*)  The

meaning of the emails themselves is far from clear,[14] and is not explained anywhere by

Plaintiffs.[15]

Exhibit D contains an assortment of unrelated documents.  It includes a copy of a fund

transfer application and some documents related to a wire transfer.  (Ex. C to 2d Am. Compl.,

Alt. 2d Am. Compl., Served 2d Am. Compl.)  None of these documents bear Allstate's name or

logo.  (*Id.*)  Also included in Exhibit D is a single document that appears to be from Allstate, but

nearly all of the identifying information is redacted.  (*See id.*)  This document may be an

example of the type of documents regarding other Allstate policyholders that Harris allegedly

transferred to Holmes and that Holmes then stored (*see id.*, *see also supra* at 8 and n. 7), as the

document does not appear to relate to Holmes or to any member of his family.  Also included in

Exhibit D are documents related to a criminal case against former Georgia state representative

Walter Ronnie Sailor, Jr. (*Id.*; *see also supra* at 8, and nn.6, 11.)  Exhibit D also includes

---

[14] For example, an email dated October 18, 2006, from Shane Moody, of Clayton Signs Inc., to "Ty" (presumably Holmes), states, in part, "Here is the contract for the Allstate location." (*Id.*)  Yet Plaintiffs do not identify Clayton Signs Inc., attach the referenced contract, or explain what it is.  Another email, dated January 16, 2007, from Harris to "Ty Maximus" (presumably Holmes), states, "U are spending it before we make it you just have to stop taking 25 to 30,000 a month out of the account and you can keep your inheritance!  [Y]ou need to stop and think!  I will send over the reports!" (*Id.*)  Yet another email, from "Ty Maximus," to Harris, which is embedded in an email dated June 12, 2008, states, "Hey Bryan, We are days away from ending this nightmare . . . We now have Jews involved in the purchase of the 125 st property...Br[y]a[]n, I need $150.00 to get my Son back home.  They are stuck in Columbia SC, with my over due serviced benz . . ." (*Id.*)

[15] The Court also notes that some of the documents in both Exhibits C and D appear to contain personal identifying information, including financial account numbers and at least one taxpayer identification number.  It thus appears that Plaintiffs' counsel has violated Rule 5.2(a) of the Federal Rules of Civil Procedure by filing these exhibits publicly, without appropriate redaction.  By separate Order of January 23, 2011, this Court has directed that these exhibits be placed under seal, pending their appropriate re-submission by Plaintiffs, in accordance with the requirements of Rule 5.2.

documents that appear to have been printed from the Georgia Secretary of State's website and contain corporate information regarding the Harris Defendants.  (*Id.*)  Finally, Exhibit D contains what appears to be a screen print of a page from a Bluebox website.  (*Id.*)

Finally, the version of the proposed Second Amended Complaint that Plaintiffs served, but did not file, contains an Exhibit E, which is comprised of a series of photographs, the subjects of which are barely discernable and are not identified in any way.  (Ex. E to Served 2d Am. Compl.)

Nothing contained in any of Plaintiffs' proposed new allegations, or in any of the above-described proposed exhibits, can render Plaintiffs' claims against Allstate viable.  If anything, the new allegations detract from, rather than support, Plaintiffs' arguments regarding the potential liability of Allstate in this case.  Citing general statements on Allstate's website regarding the nature of its financial services business cannot substitute for pleading affirmative conduct by Allstate that could have led Plaintiffs to believe that Allstate had authorized *Harris* to act as an investment counselor or to plan investments for clients.  In fact, to the extent Plaintiffs' proposed exhibits suggest that Allstate, on its website, ever made any mention of Harris, those exhibits suggest only that Harris was licensed by Allstate to sell insurance in the State of Georgia, not to engage in any other business in Allstate's name or on its behalf.  Nor can the necessary authority be reasonably inferred from the fact that Harris, who is claimed to have been an Allstate insurance agent, had an "Allstate" sign outside his office.  Nor do Plaintiffs' jumbled array of email messages aid them, as none appear to have been sent from any Allstate account; in fact, all of the emails authored by Harris appear to have been sent from his private email accounts, where he identified himself solely as the Director of Operations of Bluebox.

As nothing contained in any version of Plaintiffs' proposed Second Amended Complaint would cure the defects in Plaintiffs' claims against Allstate, I recommend that Plaintiffs' cross-motion for leave to amend, as against Allstate,[16] be denied as futile.  Further, as Plaintiffs are apparently unable to plead any factual foundation, whatsoever, for their claim that Harris had apparent authority to act for Allstate, I recommend that Plaintiffs' claims against Allstate be dismissed with prejudice.

## II.   ALLSTATE'S AND PLAINTIFFS' SANCTIONS MOTIONS

### A.   Applicable Legal Standards

#### 1.   Rule 11

Under Rule 11 of the Federal Rules of Civil Procedure, when an attorney files a complaint, motion, or other written paper, he or she is representing to the Court that, "to the best of [his or her] knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, it is not being presented for any improper purpose," Fed. R. Civ. P. 11(b)(1), and that the claims, defenses, and other legal contentions therein "are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law," Fed. R. Civ. P. 11(b)(2).  Further, in signing the submission, the attorney is representing that, after reasonable inquiry, he or she believes that "the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery."  Fed. R. Civ. P. 11(b)(3).

A party that believes Rule 11 has been violated may move for sanctions. Fed. R. Civ. P. 11(c)(2).  Rule 11, however, provides a "safe harbor":  the sanctions motion may

---

[16] To the extent Plaintiffs seek to amend their claims against the Harris Defendants, Plaintiffs' application is addressed below.

not be filed with the Court if, within 21 days of service of the motion, the offending party

withdraws the challenged claim or appropriately corrects it. *Id.* Thus, the motion – which "must

describe the specific conduct" that allegedly violates the Rule – must be served, but not filed

until at least 21 days after service. *Id.* It has been noted that this provision of the Rule, which, in

"plain language[,] . . . expressly requir[es] the serving of a formal motion," exists for "good

reason," *Lancaster v. Zufle*, 170 F.R.D. 7, 7 (S.D.N.Y. 1996), as it places the movant's

adversary on notice of the motion it will face if the matter is not remedied, *see id.* The Rule 11

"safe harbor" requirement is "strictly construed," *Banfield v. UHS Home Attendants, Inc.,* No. 96

Civ. 4850, 1997 WL 342422, at *2 (S.D.N.Y. June 23, 1997) (JFK) (citing *Hadges v. Yonkers*

*Racing Corp.,* 48 F.3d 1320, 1328 (2d Cir. 1995)), and has even been described as "jurisdictional

in nature," *R.B. Ventures, Ltd. v. Shane,* No. 91 Civ. 5678 (CSH), 2000 WL 1010400, at *2

(S.D.N.Y. July 20, 2000); *see also ESI, Inc. v. Coastal Corp.,* 61 F. Supp. 2d 35, 68 (S.D.N.Y.

1999) (where movant had not complied with mandatory "safe harbor" requirement, sanctions

motion "must be denied without a discussion of the merits of the motion"). It is an abuse of a

court's discretion to impose sanctions under Rule 11, where the Rule's "safe harbor"

requirement has not been met. *See Hadges,* 48 F.3d at 1328.

    In determining whether a plaintiff has engaged in conduct violating Rule 11's

requirements, courts apply an objective standard of reasonableness, and look to see whether the

attorney's conduct was objectively reasonable at the time the pleading was signed. *See*

*Morley v. Ciba-Geigy Corp.*, 66 F.3d 21, 25 (2d Cir. 1995); *Greenberg v. Chrust*, 297 F. Supp.

2d 699, 703 (S.D.N.Y. 2004). Where a court finds that claims or defenses have been asserted for

the sake or harassment or some other improper purpose, or that they lack any evidentiary

support, a court has the discretionary authority under Rule 11(c) to impose monetary sanctions

on either the offending party or its counsel, or both.  *Morley v. Ciba-Geigy Corp*., 66 F.3d 21, 24 (2nd Cir. 1995).  Where the violation is the assertion of an unwarranted legal claim or defense, however, a court may only impose monetary sanctions against counsel, not the represented party. Fed. R. Civ. P. 11(c)(5)(A).  A court may also "award to the prevailing party the reasonable expenses, including attorney's fees, incurred for the motion," Fed. R. Civ. P. 11(c)(2); such an award may be made against either a party or its counsel, *see* Fed. R. Civ. P. 11 (c) (5); *see also Calloway v. Marvel Entertainment Group*, 854 F.2d 1452, 1474 (2d Cir. 1988) (holding that Rule 11 sanctions may be imposed upon a represented party when the party "had actual knowledge that filing the paper constituted wrongful conduct, *e.g.* the paper made false statements or was filed for an improper purpose."), *rev'd on other grounds by Pavelic & LeFlore v. Marvel Entertainment Group,* 493 U.S. 120 (1989).

The 1993 Advisory Committee Note to Rule 11 sets forth certain factors that may be considered by the court when deciding whether to impose sanctions or what sanctions are appropriate in the given circumstances.  Those factors include:  (1) "[w]hether the improper conduct was willful, or negligent"; (2) "whether it was part of a pattern or activity, or an isolated event"; (3) "whether it infected the entire pleading, or only one particular count or defense"; (4) "whether the person has engaged in similar conduct in other litigation"; (5) "whether it was intended to injure"; (6) "what effect it had on the litigation process in time or expense"; (7) "whether the responsible person is trained in the law"; (7) what amount, given the financial resources of the responsible person, is needed to deter that person from repetition in the same case"; and (8) "what amount is needed to deter similar activity by other litigants." Fed. R. Civ. P. 11 advisory committee note to 1993 amendments; *see also, e.g., Kochisarli v. Tenoso*, No. 02 Civ. 4320, 2006 WL 721509, at *8 (E.D.N.Y. Mar. 21, 2006) (applying factors,

and citing *Simpson v. Putnam County Nat. Bank of Carmel*, 112 F. Supp. 2d 284, 291-92 (S.D.N.Y. 2000)).

### 2.        The Court's Inherent Authority

A court's inherent authority to award attorneys' fees and costs derives from "a court's need to manage its affairs so as to achieve an orderly and expeditious resolution of cases." *Bowler v. U.S. Immigration and Naturalization Service*, 901 F. Supp. 597, 605 (S.D.N.Y. 1995). Attorneys' fees may be imposed if a party has continued an action "in bad faith, vexatiously, wantonly, or for oppressive reasons." *Id.* (internal citations omitted).   The Second Circuit has reasoned that sanctions under the court's inherent authority should be based on findings that the offending party has asserted colorless claims and has acted in bad faith.  *See Eisemann v. Green*, 204 F.3d at 396.[17]

### B.        Allstate's Motion for Sanctions

Allstate's motion for Rule 11 sanctions against Plaintiffs and their counsel, Suffin, was properly made and demonstrates that sanctions are warranted, as against Suffin.

### 1.        Plaintiffs' Failure To Take Advantage of Rule 11's "Safe Harbor"

As a preliminary matter, Allstate complied with the procedural requirements of Rule 11(a).  On June 14, 2011, Allstate sent Suffin a letter, which outlined Plaintiffs' pleading deficiencies in detail, and requested that Plaintiffs voluntarily withdraw the Amended

---

[17]  "To ensure . . . that fear of an award of attorneys' fees against them will not deter persons with colorable claims from pursuing those claims, we have declined to uphold awards under the bad-faith exception absent both clear evidence that the challenged actions are entirely without color, and are taken for reasons of harassment or delay or for other improper purposes and a high degree of specificity in the factual findings of the lower courts."  *Eisemann v. Green*, 204 F.3d at 396 (quoting *Dow Chem. Pacific Ltd. v. Rascator Maritime S.A.*, 782 F.2d 329, 344 (2d Cir.1986) (emphasis added) (internal citations, quotation marks, and brackets omitted).

Complaint.  (Letter from Allstate to Suffin, dated June 14, 2011, Ex. C to Declaration of

Elizabeth D. Schrero in Support of Motion of Defendant the Allstate Corporation for Sanctions

Under Rule 11, dated July 29, 2011 ("2/29/11 Schrero Decl.") (Dkt. 28).)  Counsel for Allstate

and Suffin then participated in a telephone conference on June 16, 2011, during which Allstate's

counsel reiterated her request for Plaintiffs to withdraw the Amended Complaint.  (*See*

Memorandum of Law in Support of the Motion of Defendant the Allstate Corporation for

Sanctions under Rule 11, dated July 29, 2011 ("Allstate's Sanctions Mem."), (Dkt. 29) at 3.)  In

response, Suffin apparently requested that Allstate consent to an amendment of Plaintiffs'

pleadings.  (*Id.*)  Counsel for Allstate refused to consent without first being presented with any

evidence that supported Plaintiffs' claims against Allstate, but told Suffin that, before proceeding

with motion practice, she would consider any evidence he could show her that could support

Plaintiffs' claims.  As Allstate's counsel describes their conversation, she asked Suffin to "come

forward with any support/evidence of a factual basis for an allegation that Allstate made

representations to Plaintiffs concerning Harris' scope of authority in connection with the funds

Plaintiffs allegedly sent to Harris and Harris' alleged investment schemes."  (*Id.*) (emphasis in

original).  Allstate's counsel also sent Suffin a letter memorializing their June 16, 2011

telephone conference.  (*Id.* at 4.)

　　　　When Plaintiffs neither withdrew the Amended Complaint nor came forward with any

support for their allegations against Allstate, Allstate filed its motion to dismiss on June 28,

2011.  (*Id.*)  Allstate also prepared a motion for sanctions, which, in accordance with

Rule 11(c)(1)(A), it served on Plaintiffs on July 6, 2011 (together with a "safe harbor" letter), but

did not file.  (*See* Letter from Allstate to Holmes, dated July 6, 2011, Ex. F to July 29 Schrero

Decl.)  When Plaintiffs did not withdraw their claims within 21 days, Allstate proceeded to file

its sanctions motion with the Court.  (*See* Allstate's Sanctions Motion.)  Accordingly, Allstate's

sanctions motion is properly before the Court, and the Court must now determine whether

sanctions are justified, and, if so, whether sanctions should be imposted against Plaintiffs, Suffin,

or both.

**2.     The Relevant Factors Weigh in Favor
of Sanctioning Plaintiffs' Counsel.**

On balance, the relevant factors suggest that the imposition of sanctions against Suffin

(although not Plaintiffs) would be appropriate in this case.  In this regard, the Court notes that

the core deficiency in the Amended Complaint is the assertion of claims against Allstate that are

not warranted based on the law, a matter that falls under Rule 11(b)(2).  Under this section, as

noted above, Rule 11 sanctions against a party may not be imposed; such sanctions, where

warranted, may only be imposed on counsel.  *See Morley*, 66 F.3d at 24.

This case actually began with the filing of a *pro se* Complaint by Holmes.  When Suffin

then appeared on behalf of Holmes and the Church, Suffin proceeded to file an Amended

Complaint.  Instead of substantively revising Holmes' pleading, though, Suffin signed and filed

an amended pleading that adopted the same flawed theory as Holmes' original *pro se* pleading,

as to the claimed liability of Allstate.  In other words, in his role as counsel, Suffin appears to

have done nothing to disabuse Holmes of the notion that he had viable claims against Allstate

for, *inter alia,* conversion and fraud, based solely on Harris's conduct and alleged

representations; rather Suffin simply filed a revamped version of the same flawed allegations

against Allstate.  In fact, the Amended Complaint increased the damages originally claimed by

Holmes from $3 million to $10 million (sought "jointly and severally" from each defendant),

with an unspecified part of that sum purportedly representing damages for the death of a Church

31

member.  (Am. Compl. at ¶ 94.)  Nowhere does the Amended Complaint explain how Holmes and the Church could have standing to seek damages for a congregant's death, much less how Allstate could possibly be responsible for that death.

While this Court cannot conclude that Suffin filed the Amended Complaint in bad faith, *i.e.,* with the deliberate intent to harass Allstate or to cause it harm, it appears that, at a minimum, he failed to give adequate counsel to his clients.  Further, even if not "willful," Suffin's decision to adhere to his client's former position (and even to expand it) in the face of Allstate's repeated efforts to point out the obvious legal flaws in those claims was at least reckless.  While this litigation is still in an early stage, it is also worth emphasizing that Suffin not only filed an Amended Complaint that contained no allegations capable of supporting Plaintiffs' claims against Allstate, but also submitted three versions of a proposed Second Amended Complaint that are equally deficient.  As discussed below, Suffin also met Allstate's sanctions motion by filing a procedurally defective and utterly baseless sanctions motion of his own, against Allstate.  (*See* discussion *infra*, at 34-39.)  This is sufficient to show a pattern of frivolous filings.  *See Kochisarli v. Tenoso*, No. 02 Civ. 4320 (DRH) (MLO), 2006 WL 721509, at *8 (E.D.N.Y. Mar. 21, 2006) (imposing sanctions under Rule 11 for, *inter alia*, "submitting essentially the same indecipherable set of counterclaims for a third time").

Moreover, this is not the first time that Suffin has been criticized by the Court for filing a frivolous pleading.  In *Bibb v. New York City Housing Authority*, 09 Civ. 9956 (NRB), 2010 WL 3958646 (S.D.N.Y. Sept. 30, 2010), as Allstate points out (*see* Allstate's Sanctions Mtn. at n.5.), Suffin received a warning from the Honorable Naomi Reice Buchwald, U.S.D.J., for filing a complaint that the Court found "wholly lacking in merit, even if every fact in the complaint and supporting affidavit [were] accepted as true."  (*Id.* at *6.)  Judge Buchwald acknowledged that

the defendant's Rule 11 motion – brought against Suffin, his law firm, and plaintiff for filing "baseless and frivolous" claims – was "not unwarranted," but "given Suffin's recent admission to the bar," she "hope[d] a word of caution [would] be sufficient to encourage him to be more circumspect before commencing other actions." (*Id.* at \*6-7.) She cautioned:

> We wish to stress to Suffin that it is part of his function as an attorney, when appropriate, to explain to his client that she does not have a legitimate legal claim. Such action may assist the client in appreciating the situation in which she finds herself . . . We are hopeful that Suffin will use better judgment in the future.

(*Id.* at \*7.)[18] It does not appear that Suffin took the Court's "word of caution" to heart, in this case. Further, while Judge Buchwald noted, in her 2010 opinion, that Suffin was "recently admitted to the bar," he now holds himself out as having been in practice for four years and as having handled matters in a wide range of practice areas.[19] At this point, there is less reason to be forgiving of Suffin's unwillingness or inability to educate and guide his clients when they lack a legitimate claim.

In addition, the pleading defect at issue here – the lack of any allegations capable of supporting a legal claim against Allstate – infected Plaintiffs' entire pleading, as to Allstate. Suffin's filing of a deficient pleading, and equally deficient proposed amended pleadings has also slowed the litigation and necessitated the expenditure of both time and money by Allstate to move against Plaintiffs' claims and to oppose his futile cross-motion to amend.

---

[18] Allstate also points out the Court has previously sanctioned Suffin for violating its rules. *See Dvorkin v. New York-Presbyterian Hospital*, 10 Civ. 3680 (GBD) (AJP), 2011 WL 280801, at \*4 (S.D.N.Y. Jan. 19, 2011) (affirming, although modifying, sanction imposed by magistrate judge for counsel's failure to bring his client to a settlement conference, as directed by the Court) (cited in Allstate Mem., at n.5).

[19] *See* http://lawyers.law.cornell.edu/lawyer/eric-andrew-suffin-1327035.

All of these factors suggest that, while (in the absence of a showing of bad faith) the Court should not exercise its inherent authority to sanction Suffin, at least some Rule 11 sanction would be warranted here.  The Court notes, however, that Suffin is a solo practitioner, who may not have significant resources to pay a substantial sanctions award.  It is difficult for the Court to determine, without additional information, the amount of a sanctions award that would be needed to deter Suffin from further Rule 11 violations, or, by extension, to deter similar activity by others.  This Court will return to this question after first addressing the merits of Plaintiffs' sanctions motion against Allstate, given that Allstate is not only seeking sanctions on its own motion, but is also seeking sanctions for having to oppose Plaintiffs' motion.

### C.   Plaintiffs' Sanctions Motion Against Allstate

After Allstate moved for Rule 11 sanctions against Plaintiffs and their counsel, Plaintiffs filed a Rule 11 motion against Allstate.  Unlike Allstate's motion, however, Plaintiffs' motion was not properly made, and should not be considered by the Court because of its procedural defects.  In any event, even if the Court were to consider the motion, it should be denied as wholly lacking in merit.  Indeed, Plaintiffs' sanctions motion is itself frivolous.

### 1.   Plaintiffs' Failure To Satisfy the Procedural Requirements of Rule 11

On August 22, 2011, Plaintiffs sent a letter to Jay Cho, Esq. ("Cho"), counsel for Allstate, stating that Allstate had violated Rule 11(b)(b)(3).  (*See* Letter from Suffin to Cho, dated Aug. 22, 2011 ("8/22/11 Suffin Ltr."), Ex. A to Declaration of Eric Andrew Suffin in Support of Plaintiffs' Motion for Rule 11 Sanctions, dated Sept. 30, 2011 ("9/30/11 Suffin Decl.") (Dkt. 52).)  This is the provision of Rule 11 under which an attorney is supposed to certify to his or her reasonable, informed belief that "the factual contentions [made in a pleading or other written submission] have evidentiary support or, if specifically so identified, will likely

have evidentiary support after a reasonable opportunity for further investigation or discovery."
Fed. R. Civ. P. 11(b)(3).  Here, Suffin's August 22 letter listed certain statements from
submissions made by Allstate and, without any elaboration or explanation, merely claimed that
the statements were false and without evidentiary support.  The letter only stated that,
"[p]ursuant to Fed. R. Civ. P. 11(c) and for the specific reasons described below, we request that
the parts of the memos and Declaration in violation of Fed. R. Civ. P. 11(b)(3) be withdrawn or
appropriately corrected within 21 days or within some other time set by the court."  (8/22/11
Suffin Ltr., at 1-2.)  The letter did not explicitly state that Plaintiffs were going to file a sanctions
motion, and it did not enclose a copy of any sanctions motion.

On August 30, 2011, Suffin wrote another letter to Cho.  (Letter from Suffin to Cho,
dated Aug. 30, 2011 ("8/30/11 Suffin Ltr."), Ex. B to 11/30/11 Suffin Decl.)  The language of
the August 30 letter mirrored the language of the August 22 letter, but also complained of
additional statements by Allstate.  (*See* 8/30/11 Suffin Ltr., at 2.)  Like the earlier letter, the
August 30 letter did not explicitly state that Plaintiffs were going to file a sanctions motion and it
did not include a copy of the sanctions motion that was eventually filed by Plaintiffs.  (*Id.*)  As
explanation for the request to withdraw the listed statements, Suffin merely wrote that they did
"not have evidentiary support as required by Fed. R. Civ. P. 11(b)(3) and were false." (*Id.*)

Plaintiffs then went ahead and filed their Rule 11 motion on September 30, 2011, in
disregard of the "safe harbor" procedural requirements set out in the Rule.  Although Plaintiffs
now ask the Court to "treat the August 22, 2011 and August 30, 2011 letters . . . as fulfilling
Plaintiffs' requirement to serve the Rule 11 Motion twenty one (21) days before presenting it to
the Court" (Plaintiffs' Memorandum of Law in Further Support of Plaintiff's Motion for Rule 11
Sanctions, dated Oct. 24, 2011 ("Pl. Reply to Pl. Sanctions Mtn.") (Dkt. 59), at 2), this Court has

35

repeatedly refused to impose sanctions based on mere warning letters, even where the challenged

conduct was sanctionable.  *See Gamla Enterprises North America, Inc. v. Lunor-Brillen Design

U. Vertriebs GMBH*, No. 98 Civ. 992, 2000 WL 193120, at *3 (S.D.N.Y. Feb. 17, 2000)

(denying meritorious Rule 11 motion where warning to offending party was given by letter

alone, even where warning letter "conformed to the spirit of the rule"); *see also Diamonds.net*

*LLC v. Idex Online, Ltd.*, 254 F.R.D. 475, 476-77 (S.D.N.Y. 2008) (finding that a warning letter

does not satisfy the Rule 11 requirement of serving a formal motion); *Weeks Stevedoring Co.*

*Inc. v. Raymond Int'l Buildiers, Inc.*, 174 F.R.D. 301, 305 (S.D.N.Y. 1997 (same); *Bellistri v.*

*US*, No. 94 Civ. 3768 (KMW), 1997 WL 115545, at *3 (S.D.N.Y. Mar. 14, 1997) (same); *Gal v.*

*Viacom International, Inc.*, 403 F. Supp. 2d 294, 309 (S.D.N.Y. 2005) (same); *Schweizer v.*

*Mulvehill*, 93 F. Supp. 2d 376, 413 (S.D.N.Y. 2000) (same).[20]

     Accordingly, based on the express language of Rule 11 and this Court's precedent,

Plaintiffs' sanctions motion should be denied as procedurally defective.

### 2.    **Plaintiffs' Motion Is Also Meritless**

     In any event, even if Rule 11's procedural requirements could be deemed satisfied by the

service of Suffin's warning letters, Plaintiffs' sanctions motion would completely fail on its

merits, as it does nothing more than catalog five statements made at various points, by Allstate

or its counsel, and assert – without any explanation – that these statements lack evidentiary

support.  (Plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion for Rule 11

---

[20] *But see Jeffreys v. Rossi*, 275 F. Supp. 2d 463, 480 (S.D.N.Y. 2003) (finding that
movant substantially complied with Rule 11 procedural requirements by serving a "detailed
letter," with attached evidentiary support).

Sanctions, dated Sept. 30, 2011, ("Pl. Sanctions Mem.") (Dkt. 53), at 2.)  The challenged Allstate statements are as follows:

>    (1)    ". . . Holmes is claiming to be in wrongful possession of confidential documents belonging to Allstate (which, if true, would have been taken without Allstate's authorization), the reference to those documents can have no purpose other than to attempt to prompt a settlement offer from Allstate." (Memorandum of Law in Support of the Motion of Defendant the Allstate Corporation To Dismiss the Amended Complaint as Against the Allstate Corporation, dated June 28, 2011 ("Allstate Mtn.-To-Dismiss Mem.") (Dkt. 20), at 22, n.7.)

>    (2)    ". . . where, as here, the Plaintiff's attorney:  (1) has advanced meritless factual allegations that have no evidentiary support; and (2) has failed to investigate the law before bringing an action and filing and serving a complaint that fails woefully to comply with the well established pleading requirements of the FRCP, Allstate must turn to Rule 11 for legal recourse." (Allstate Sanctions Mem. at 1.)

>    (3)    ". . . there is no good faith basis for Plaintiffs to proceed with the instant action against Allstate." (*Id.*)

>    (4)    "The obvious frivolity of the Complaint . . ." (*Id.*)

>    (5)    "A copy of a black-lined version of the Proposed Second Amended Complaint showing a comparison against the Complaint, dated August 3, 2011, is attached hereto as Exhibit 'A.'" (Declaration of Elizabeth D. Schrero in Further Support of Motion of Defendant the Allstate Corporation To Dismiss the Amended Complaint and in Opposition to Plaintiffs' Cross-Motion for Leave To Amend Their Amended Complaint, dated Aug. 19, 2011 (Dkt. 45), ¶ 2.)

(*Id.* at 2-3.)

Most of these statements – including statements that Plaintiffs' counsel failed to comply with pleading requirements, lacked good faith in proceeding with unsupported claims against

Allstate, and filed an obviously frivolous pleading – are in the nature of arguments advanced on Allstate's motions to dismiss and for sanctions. As they are not "factual contentions," these statements are not even not covered by the provision of Rule 11 on which Plaintiffs rely for their sanctions motion. (*See* Plaintiffs' Sanctions Mem. at 2 (citing Fed. R. Civ. P. 11(b)(3).) Moreover, for the reasons discussed above, this Court generally agrees that Plaintiffs' claims against Allstate *were* unsupported and frivolous.

To the extent Plaintiffs complain about Allstate's supposition that Plaintiffs may have been attempting to exact a settlement from Allstate by referring to Holmes' cache of confidential Allstate documents, this Court also agrees that this is how Plaintiffs' conduct appeared; indeed, on this subject, Plaintiffs' counsel himself made statements to the Court that lend credence to Allstate's stated concerns. During a case management conference on July 26, 2011, Allstate's counsel told the Court that she had spoken with Suffin about the confidential documents, and that Suffin had demanded $30,000 for the transfer of the documents to Allstate. (July 26, 2011 Rule 16 Conference Transcript, at 10, Ex. D to 10/17/11 Schrero Decl.) Suffin said that counsel had misunderstood his statements, and that he had only "discussed that there may be a dollar amount that would be involved in the transfer." (*Id.* at 12.) Nonetheless, Suffin did not deny that he had mentioned the $30,000 figure to Allstate's counsel in their conversation (*see id.* at 13), and when asked by the Court why Holmes even had possession of Allstate documents bearing confidential, personal information of policyholders, Suffin repeatedly expressed his understanding that Holmes believed the documents were "collateral" for his investments. (*See id.* at 12, 13, 14.) Under the circumstances, Allstate's suggestion that Holmes may have been trying to "prompt a settlement offer" is hardly unsupported.

38

Finally, the Court could not even discern what Plaintiffs were complaining about, with regard to Allstate's proffered black-lined version of the proposed Second Amended Complaint until Plaintiffs argued, on reply, that Allstate's black-lining did not incorporate the exhibits attached to the proposed amended pleading.  (*See* Pl. Reply to Pl. Sanctions Mtn. at 5.) Plaintiffs' contention on this point is patently frivolous.  A black-lined document is intended to track changes made in the text of a document, and Plaintiffs apparently have no quarrel with whether Allstate accurately tracked any proposed modifications to their original allegations. Moreover, Allstate's black-lined document, submitted for the convenience of the Court, shows that exhibits were added to the proposed Second Amended Complaint.  (*See* Ex. A to 8/19/11 Schrero Decl., ¶¶ 48 (highlighting addition of reference to Ex. A), 118 (highlighting addition of allegation that "Plaintiff's causes of action may be supported by documents, including but not limited to documents attached as Exhibits A, B, C and D").)

As Plaintiffs have not demonstrated that a single statement made by Allstate was, in fact, either false or unsupported, Plaintiffs' sanctions motion cannot succeed, even apart from its procedural flaws.  To the contrary, it is a plainly meritless motion, and Allstate legitimately asks that Plaintiffs or their counsel be made to bear Allstate's fees and costs in having to respond to it. (*See* Defendant The Allstate Corporation's Memorandum of Law in Opposition to Plaintiffs' Motion For Sanctions Under Rule 11, dated Oct. 17, 2011 (Dkt. 58), at 16; *see also* Fed. R. Civ. P. 11(c)(2) (allowing a court to award the fees and costs of a sanctions motion to the prevailing party).)

### D.   Appropriate Sanctions Award in This Case

Based on the flaws in Plaintiffs' pleaded claims against Allstate, the fact that Plaintiffs, through counsel, insisted on proceeding with these defective claims despite notice of the defects,

and the fact that Allstate has, as a result, incurred fees and costs in what should have been unnecessary motion practice, I recommend that sanctions be awarded in Allstate's favor, and that the award be made against Suffin, as counsel.

As noted above, however, the Court is not currently in a position to determine the appropriate amount of a monetary sanction, given that it lacks information regarding Suffin's financial circumstances. Accordingly, I recommend that Allstate be directed to submit to the Court an itemized statement of the attorneys' fees and costs it incurred on its motion to dismiss, as well as on both of the sanctions motions, and that Suffin be directed to submit a sworn affidavit or declaration made under penalty of perjury, setting out the net income earned by his law practice over the past 12 months. I further recommend that Suffin be required, under Rule 11(c), to pay to Plaintiffs the reasonable fees and expenses incurred in filing or opposing the referenced motions, up to a cap of 10 percent of the annual net income received from his law practice, as reflected in his financial affidavit or declaration. *See Weinraub v. Glen Rauch Securities, Inc.*, 419 F. Supp. 2d 507, 520 (S.D.N.Y. 2005) (noting that under Rule 11, a court must consider the financial circumstances of the sanctioned party); *see also Association of Holocaust Victims for Restitution of Artwork and Masterpieces v. Bank Austria Creditanstalt AG*, No. 04 Civ. 3600 (SWK), 2005 WL 3099592, at *8 (S.D.N.Y. Nov. 17, 2005) ("As a final matter of the [Rule 11] sanctions determination, courts must take into account the financial circumstances of the sanctioned party." (citing *Sassower v. Field*, 973 F.2d 75, 81 (2d Cir. 1992)); *Anschutz Petroleum Marketing Corp. v. E.W. Saybolt & Co., Inc.*, 112 F.R.D. 355, 357 (S.D.N.Y. 1986) (finding that "adequate deterrence may permissibly fall short of full compensation," and that the court has the discretion to fashion a Rule 11 sanction for purposes of deterrence which awards part, but not all, of the opposing party's attorney's fees); *Becker v.*

40

*Dunkin' Donuts of America, Inc.*, 665 F. Supp. 211, 217-18 (S.D.N.Y. 1987) (taking into consideration offending litigant's ability to pay, even though sanctions were fully warranted).

## III.   **THE HARRIS DEFENDANTS' MOTION TO DISMISS**

As noted above (*see* n.2, *supra*), the Harris Defendants never properly filed their motion to dismiss on the Court's ECF system, and the Court would be entitled to reject the motion on that basis.  I do not recommend this, however, as some of the pleading issues raised by the motion are significant, and, for the sake of efficient case management, it would be preferable to resolve those issues as early as possible.  For this reason, this Court has considered the merits of the Harris Defendants' motion.

### A.   **Applicable Legal Standards**

The standards governing motions to dismiss brought under Rule 12(b)(6) of the Federal Rules of Civil Procedure are set forth in connection with this Court's discussion of Allstate's motion to dismiss.  (*See supra*, at 12.)  Additionally relevant to the Harris Defendants' motion are Rules 8(a) and 9(b), which address the question of how specific a plaintiff's allegations must be.

Rule 8(a) states that a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Under this Rule, a pleading "does not have to set out in detail the facts on which the claim for relief is based, but must give the court and the defendant fair notice of what [the] plaintiff's claim is and the grounds upon which it rests."  *Owens v. Suter,* 02 Civ. 8198 (SHS), 2003 WL 942554, at *1 (S.D.N.Y. Mar. 7, 2003) (internal citations and quotations omitted); *see Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988) ("The statement should be plain because the principal function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted.").

Rule 8(a) is violated where a plaintiff, by engaging in "group pleading," fails to give each defendant fair notice of the claims against it. *Pierson v. Orlando Regional Healthcare Systems, Inc.*, 619 F. Supp. 2d 1260, 1273 (M.D. Fla. 2009) (dismissing complaint because group-pleading method of collectively referring to individual defendants and two physician groups as "Peer Review Defendants" throughout complaint did not satisfy the "fair notice" requirement of Rule 8).

Rule 9(b) requires a party to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).  To state a claim for fraud under New York law, a party must plead that:  (1) the defendant(s) made a material false representation or omission, (2) the defendant(s) intended to defraud the plaintiff(s) thereby, (3) the plaintiff(s) reasonably relied upon the representation, and (4) the plaintiff(s) suffered damage as a result of this reliance. *Banque Arabe et Internationale D'Investissement v. Md. Nat'l Bank*, 57 F.3d 146, 153 (2d Cir. 1995) (relying on New York law) (citations omitted).  To satisfy the Rule 9(b) pleading requirements, a complaint alleging fraud must:  "(1) specify the statement [or omissions] that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements [or omissions] were made, and (4) explain why the statements [or omissions] were fraudulent. *Scantek Medical, Inc. v. Sabella*, 583 F. Supp. 2d 477, 493 (S.D.N.Y. 2008) (internal quotations and citations omitted).

In addition, a fraud complaint must also "allege facts that give rise to a strong inference of fraudulent intent," which may be accomplished "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Id.*  Motive involves "concrete benefits that could be realized by one or more of the false statements . . . alleged" and

opportunity is shown by "the means and likely prospect of achieving concrete benefits by the means alleged." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994).  To allege conscious misbehavior or recklessness, "the Complaint must link the misleading statement with facts that give rise to an inference that the speaker had a basis for knowing it was false." *Shahzad v. H.J. Meyers & Co.*, 923 F. Supp. 57, 60 (S.D.N.Y. 1996) (citations omitted).

Rule 9(b) also requires plaintiffs to "connect the allegations of fraud to each individual defendant." *Trustees of Plumbers and Pipefitters Nat. Pension Fund v. De-Con Mechanical Contractors, Inc.*, 896 F. Supp. 342, 347 (S.D.N.Y. 1995); *see also Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993) ("Rule 9(b) is not satisfied where the complaint vaguely attributes the alleged fraudulent statements to 'defendants.'").  Plaintiffs alleging fraud "may not rely on sweeping references to acts by all or some of the defendants because each named defendant is entitled to be apprised of the facts surrounding the alleged fraud." *Trustees of Plumbers and Pipefitters Nat. Pension Fund*, 896 F. Supp. at 347.  Further, the allegations must demonstrate that "each [d]efendant had a specific intent to defraud either by devising, participating in, or aiding and abetting the scheme." *Id.*

The pleading requirements of Rule 9(b) apply both to fraud claims and to "other claims that are premised on fraud." *Daly v. Castro Llanes*, 30 F. Supp. 2d 407, 414 (S.D.N.Y. 1998) (citing *O'Brien v. Nat'l Property Analysts Partners*, 936 F.2d 674, 676 (2d Cir. 1991)).  The particularity requirements of Rule 9(b) also apply to negligent misrepresentation claims.  *In re Marsh & McLennan Cos. Sec. Litig.*, 501 F. Supp. 2d 452, 495 (S.D.N.Y. 2006) ("Negligent misrepresentation claims must be pleaded with particularity pursuant to Rule 9(b).").  Accordingly, Plaintiffs' claims of fraud, negligent misrepresentation, and violation of New York York Debtor and Creditor Law § 276 are all subject to Rule 9(b)'s pleading requirements.  *See*

*also In re Sharp Intern. Corp*. 403 F.3d 43, 54 (2d Cir. 2005) (noting that New York Debtor and Creditor Law § 276 must be pleaded with specificity, under Rule 9(b)).

###### B.      Adequacy of Plaintiffs' Allegations Against the Harris Defendants

In their motion to dismiss, the Harris Defendants argue, first, that Holmes does not have authority to speak for Samuel's Temple and thus lacks "standing" to assert claims on the Church's behalf.  Second, the Harris Defendants argue that Plaintiffs' claims as to them fail under Rules 8(a), 9(b), and 12(b)(6) of the Federal Rules of Civil Procedure.  While their asserted "standing" argument appears misplaced, the Harris Defendants' arguments for dismissal of the Amended Complaint on the basis of pleading deficiencies are persuasive.

###### 1.      Propriety of Naming Samuel's Temple as a Plaintiff

As an initial matter, the Harris Defendants contend that Samuel's Temple is not controlled by Holmes and that the Church itself never assented to bringing this action.  (*See* Harris Defs. Mem., at 6; *see also id.,* at 8 (stating that Holmes "has no authority whatsoever to bring this lawsuit on behalf of the Church").)  Rather, the Harris Defendants assert that the person with authority to act for the Church is Shirley Holmes Sulton ("Sulton"), Senior Pastor (and purportedly the only pastor) of Samuel's Temple and Harris's mother, who, they contend, has not authorized this lawsuit.  (*Id.*)  In support of their position on this point, the Harris Defendants attach a declaration of Sulton, in which she states:

> My son Tyrone is not the pastor, nor has he ever been the pastor of Samuel's Temple.  Furthermore, he has no executory or signatory powers associated with the church.  I maintain and control all financial matters concerned with the church.  Neither the church nor I have instituted any lawsuit or proceedings against Mr. Bryan Michael [Harris].  Any monies that I have sent to Mr. Bryan Michael Harris, whom I consider a loyal and committed son, are personal matters between Mr. Harris and me.  I am not, nor will I become a party to the current lawsuit fostered by my son against

44

> Mr. Harris.  Samuel's Temple COGIC is also not a party to the
> suit.  My son, Tyrone, does not possess the signatory powers of the
> church to institute a suit against Mr. Harris.

(Declaration of Frank Wheaton in Support of Defendants' Motion to Dismiss the Amended

Complaint of Plaintiffs, dated Oct. 10, 2011 ("Wheaton Decl.") (Dkt. 56), at Ex. C (Declaration

of Shirley Holmes-Sulton, dated Aug. 12, 2011 ("Sulton Decl.")), at 1.)  The Harris Defendants

also appear to contend that the funds at issue in this case are *Church* funds, and that Holmes has

no personal standing to assert claims for recovery of those funds.  (*See* Harris Defs. Mem., at

8-9.)

 In response to these arguments, Plaintiffs submit certain documents purporting to show

the Church's authorization for the suit.  (*See* 11/10/11 Suffin Decl., at Ex. C (email from Sulton

to Holmes, dated Oct. 18, 2011, and attachment), Ex. D (Resolution and Minutes of Special

Meeting of the Samuel Temple Church of God in Christ, Inc.).)  Plaintiffs also submit their

proposed "Alternative Second Amended Complaint" in response to the Harris Defendants'

arguments.  (Alt. 2d Am. Compl.)

 Given that Samuel's Temple has itself been named as a plaintiff in this case and is

asserting claims on its own behalf, it is evident that the Harris Defendants' argument regarding

the Church is not appropriately styled as a "standing" argument.  Certainly, the Church would be

a real party in interest to a dispute over the disposition of Church funds.  What the Harris

Defendants actually argue, with respect to the Samuel's Temple, is that whoever purported to act

on its behalf in authorizing this lawsuit was without power to do so.  As shown by the parties'

competing submissions, this raises an issue of fact that cannot be resolved without a more

complete record.

As for the Harris Defendants' seeming argument that Holmes has no standing to challenge the alleged conversion of funds belonging to the Church, it is unclear whether Holmes may be claiming any personal interest in the money, or, alternatively, whether he may be seeking to proceed as a third-party beneficiary to agreements allegedly made between the Church and any of the Harris Defendants regarding the use of the funds in question.  For example, while Holmes may have never had a right to direct Harris to purchase a home for him with Church money, if this was something that Harris promised to Samuel's Temple, and Holmes stood to benefit from the purchase, then he may have standing to assert claims against Harris in his own right, for breach of that promise.  Moreover, several of the allegations in the Amended Complaint, while confusing because they draw no clear distinction between the two plaintiffs, appear to relate to personal claims by Holmes.  For instance, Holmes seems to claim that Harris promised him employment at Bluebox, and then reneged on that promise.  Regardless of the viability of such claims, there seems to be little question that Holmes would have a personal stake in their outcome.

For these reasons, the Harris Defendants' challenge to Plaintiffs' "standing" should be rejected at this time, without prejudice to raise the issue again at a later juncture, on a clearer pleading and a more complete record, should the case proceed.

## 2. <u>Sufficiency of Pleading Under Rules 8(a) and 9(b)</u>

The Harris Defendants are more persuasive in their argument that the Amended Complaint fails to satisfy the pleading requirements of Rules 8(a) and 9(b).  The most glaring defect, under both rules, is Plaintiffs' pervasive "group pleading," both with respect to (a) the injuries sustained by "plaintiffs" (referred to collectively) and (b) the alleged misconduct of "defendants" (also referred to collectively).  As to the former, as noted above, the Amended

Complaint fails to specify whether Holmes entrusted any of his own money to any defendant, and, if not, the nature of the consideration he may have provided for any promises made to him personally.  As to the latter, it appears that Plaintiffs or their counsel may have simply conducted an online search for companies of which Harris was an officer (*see* Ex. D to proposed 2d Am. Compl.), and then named those companies as additional defendants without any knowledge or information as to what role, if any, each of them may have played in the transactions alleged.

Plaintiffs' failure to differentiate among the Harris Entities, so as to allege the nature of each particular defendant's misconduct, has resulted in a failure by Plaintiffs to give each defendant "fair notice" of Plaintiffs' claims and "the grounds upon which [they] rest[]," as required by Rule 8(a).  *Owens*, 2003 WL 942554, at *1 (internal citations and quotations omitted).  For essentially the same reason, and as the Amended Complaint also wholly fails to particularize any statements by Defendants that were allegedly false or misleading, Plaintiffs have grossly violated Rule 9(b), as well.  *See Trustees of Plumbers and Pipefitters Nat. Pension Fund*, 896 F. Supp. at 347.

As to the Harris Defendants' arguments regarding the independent insufficiency of each of Plaintiffs' claims under Rule 12(b)(6),[21] the vagueness of much of the Amended Complaint makes it difficult for the Court even to consider those arguments.  It is impossible to determine, for example, whether Plaintiffs' conversion claim necessarily duplicates their breach-of-contract

---

[21] The Court notes that the arguments advanced by the Harris Defendants, with respect to whether Plaintiffs have adequately pleaded the elements of their individual claims, appear to have been copied nearly verbatim from Allstate's memorandum in support of its motion to dismiss.  *Compare* Allstate Mtn.-To-Dismiss Mem. at 4-7; 11-22, *e.g., with* Harris Defs. Mem., at 12-14; 14-23.

claim, as the Harris Defendants argue (*see* Harris Defs. Mem., at 15 (citing *Salem v. Software Guidance and Assistance, Inc.*, No. 96 Civ. 8437(AGS), 1997 WL 777402, at *5 (S.D.N.Y. Dec. 16, 1997))), when the particular contract(s) at issue are not well identified and when the subject of Plaintiffs' claim of conversion may be money, but may also be tangible goods.  (*See, e.g.,* Am. Compl. at ¶ 84 (alleging that Defendants "comingled and fraudulently converted plaintiffs' investment capital for defendant Harris's pecuniary gain"); ¶ 80 (alleging conversion of "various personal property owned by plaintiff Holmes, including a rifle, hard drives, two (2) Mackie speakers, video footage, and sound tools essential to plaintiff Holmes's music and television production, documents, video masters, and music masters").)

Similarly, the Court cannot discern whether, as the Harris Defendants argue, Plaintiffs' conversion claim is barred by the applicable three-year statute of limitations (*see* Harris Defs. Mem., at 15), given that the Amended Complaint alleges that Harris converted the physical property of Holmes "[a]t some point in 2008" (Am. Compl. at ¶ 80), but does not specify when in 2008 the alleged conversion occurred.  Further, to the extent Plaintiffs are claiming the conversion of money, *see, e.g., Ehrlich v. Howe,* 848 F. Supp. 482, 492 (S.D.N.Y. 1994) (noting that an action for conversion of money may lie if the pleading alleges that "the money converted was in specific tangible funds of which the claimant was the owner and entitled to immediate possession"), the Amended Complaint only alleges when certain funds were transferred to the Harris Defendants (*see* Am. Compl. at ¶¶ 55-58, 60), not when any particular acts of conversion occurred.

Because of the significant pleading defects present in the Amended Complaint against the Harris Defendants – defects that are not remedied by any version of Plaintiffs' proposed Second Amended Complaint – I recommend that the Harris Defendants' motion to dismiss be

granted under Rules 8(a) and 9(b) of the Federal Rules of Civil Procedure.  In this instance, though, I recommend that the dismissal be without prejudice to filing an amended pleading that actually addresses the defects identified herein, as Plaintiffs may have viable claims against Harris and/or one or more of the Harris Entities, for, *inter alia,* misappropriating a large sum of money allegedly entrusted to them.  *See* Fed. R. Civ. P. 15(a) (stating that courts "should freely give leave [to amend] when justice so requires"); *Rich v. Maidstone Fin., Inc.*, No. 98 Civ. 2569 (DAB), 2001 WL 286757, at *12 (S.D.N.Y. Mar. 23, 2001) (holding that leave to amend should be given when the court "cannot determine that the plaintiff could not, under any circumstances, sufficiently allege its claims" (internal quotation marks and citation omitted)).

Finally, given the defects that have, to date, been manifest in each of Plaintiffs' pleadings or proposed pleadings, I further recommend that Plaintiffs and their counsel be strongly cautioned by the Court that, if they choose to proceed with a further amendment, (1) they take care to plead the claims of the Church and of Holmes individually, with allegations that show a basis for each claim, as to the plaintiff asserting it, (2) they not name as a defendant any corporate entity without a good faith basis for believing that the particular entity engaged in any activity that constituted an actionable wrong, and they provide each such defendant with notice of its specific alleged wrongdoing, and (3) they plead all claims falling within the ambit of Rule 9(b) with the particularity necessary to satisfy that Rule's requirements, as described herein.

## CONCLUSION

For all of the foregoing reasons, I respectfully recommend that the Court:

(1)     grant Allstate's motion to dismiss the Amended Complaint (Dkt. 18), with prejudice;

49

     (2)       deny Plaintiffs' cross-motion for leave to amend as against Allstate (Dkt. 33);

     (3)       grant Allstate's sanctions motion to the extent it seeks Rule 11 sanctions against Plaintiffs' counsel, and otherwise deny the motion (Dkt. 27);

     (4)       deny Plaintiffs' motion for sanctions against Allstate (Dkt. 51);

     (5)       impose Rule 11 sanctions on Plaintiffs' counsel in the manner set forth *supra* at 39-41;

     (6)       grant the Harris Defendants' motion to dismiss the Amended Complaint (*see* Dkt. 55), without prejudice; and

     (7)       afford Plaintiffs 30 days to file a Second Amended Complaint that cures the pleading defects against the Harris Defendants, as discussed herein.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. *See also* Fed. R. Civ. P. 6. Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Laura T. Swain, United States Courthouse, 500 Pearl Street, Room 755, New York, New York 10007, and to the chambers of the undersigned, United States Courthouse, 500 Pearl Street, Room 525, New York, New York, 10007. Any requests for an extension of time for filing objections must be directed to Judge Swain. FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson*, 968 F.2d

298, 300 (2d Cir. 1992); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988); *McCarthy v.*

*Manson*, 714 F.2d 234, 237-38 (2d Cir. 1983).

Dated:   New York, New York
         January 27, 2012

                              Respectfully submitted,


                              _____
                              DEBRA FREEMAN
                              United States Magistrate Judge



Copies to:

Hon. Laura T. Swain, U.S.D.J.

All parties (via ECF)